UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| RANDI R. W.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 3:18-CV-392-MGG |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff, Randi R. W. ("Ms. W.") seeks judicial review of the Social Security Commissioner's decision denying her application, dated September 6, 2014, for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This Court may enter a ruling in this matter based on parties' consent pursuant to 28 U.S.C. § 636(b)(1)(B) and 42 U.S.C. § 405(g). For the reasons discussed below, the Court **REVERSES AND REMANDS** the decision of the Commissioner of the Social Security Administration ("SSA").

**I.    OVERVIEW OF THE CASE**

Ms. W. is a nurse and mother of three who was 36 years old on October 4, 2013, the date she alleges he became disabled as the result of her multiple sclerosis ("MS"), cervical spine pain, depression and anxiety disorders, headaches, vision disturbance in

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the Court refers to the plaintiff by first name and last initial only.

her right eye, and memory difficulties. Having completed a nursing degree, Ms. W. worked from 2010 until 2013 as a registered nurse. She had previously worked as a fast food manager. Her date last insured is December 31, 2014. Ms. W. began experiencing MS-related symptoms in 2010 that were exacerbated during her last pregnancy in 2013. She was diagnosed with multiple sclerosis June 2014 after treating for headaches, back and body pain, and neuropathy.

On August 16, 2017, an administrative law judge ("ALJ") found Ms. W. not to be disabled as defined by the Social Security Act ("Act") and denied her requested DIB. On February 26, 2018, the Appeals Council denied Ms. W.'s timely request for review making the ALJ's August 2017 decision the final decision of the Commissioner. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005). Now ripe[2] before this Court is Ms. W.'s complaint for judicial review of the Commissioner's unfavorable decision under 42 U.S.C. § 405(g).

## II. DISABILITY STANDARD

In order to qualify for DIB, a claimant must be "disabled" under Sections 223(d) of the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

---

[2] Plaintiff's complaint became ripe on April 3, 2019, without any reply brief being filed. *See* N.D. Ind. L.R. 7-3(d).

2

The Commissioner's five-step inquiry in evaluating claims for disability benefits under the Act includes determinations as to: (1) whether the claimant is doing substantial gainful activity ("SGA"); (2) whether the claimant's impairments are severe; (3) whether any of the claimant's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404; (4) whether the claimant can perform her past relevant work based upon her residual functional capacity ("RFC"); and (5) whether the claimant is capable of making an adjustment to other work. 20 C.F.R. §§ 404.1520; *see also Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). The claimant bears the burden of proof at every step except Step Five. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

### III. STANDARD OF REVIEW

This Court has authority to review a disability decision by the Commissioner pursuant to 42 U.S.C. § 405(g). However, this Court's role in reviewing Social Security cases is limited. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). A court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts of evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). The Court must give deference to the ALJ's decision so long as it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (citing *Similia v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). The deference for the ALJ's decision is lessened where the ALJ's findings contain errors of fact or logic or fail to apply the correct legal standard. *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013).

Additionally, an ALJ's decision cannot be affirmed if it lacks evidentiary support or an inadequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). An ALJ's decision will lack sufficient evidentiary support and require remand if it is clear that the ALJ "cherry-picked" the record to support a finding of non-disability. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Wilson v. Colvin*, 48 F. Supp. 3d 1140, 1147 (N.D. Ill. 2014). At a minimum, an ALJ must articulate his analysis of the record to allow the reviewing court to trace the path of his reasoning and to be assured the ALJ has considered the important evidence in the record. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). While the ALJ need not specifically address every piece of evidence in the record to present the requisite "logical bridge" from the evidence to his conclusions, the ALJ must at least provide a glimpse into the reasoning behind his analysis and the decision to deny benefits. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *see also Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).

Thus, the question upon judicial review is not whether the claimant is, in fact, disabled, but whether the ALJ used "the correct legal standards and the decision [was] supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2007). Substantial evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th. Cir. 2007). Thus, substantial evidence is simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017).

IV.     ANALYSIS

Ms. W. challenges the ALJ's RFC determination alleging errors of law and lack of the necessary logical bridge from the evidence to the RFC. The ALJ defined Ms. W.'s RFC as being capable of performing light work

> except for the following limitations: the claimant can lift or carry ten pounds occasionally and ten pounds frequently . . . . operate foot controls with her right foot occasionally, . . . handle or finger items frequently with the right hand . . . .occasionally climb ramps and stairs . . . never climb ladders, ropes or scaffolds; frequently balance; frequently kneel;l and heights or moving mechanical parts. Additionally, due to moderate limits in concentration, persistence, or pace, she can understand, remember and carryout simple, routine and repetitive tasks; . . . engage in no more than occasional decision-making [and] be exposed to no more than occasional changes in job setting.

[DE 12 at 33].

A claimant's RFC is the most activity in which she can engage in a work setting despite the physical and mental limitations that arise from her severe and non-severe impairments and related symptoms. 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96-8p; *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009). In crafting an RFC, the ALJ must consider "all of the relevant medical and other evidence" in the record. 20 C.F.R. § 404.1545(a)(3); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

Here, Ms. W. specifically alleges that the ALJ's RFC, and consequently his hypothetical to the vocational expert at the hearing, were flawed because he improperly weighed medical opinion evidence based upon a misinterpretation of the ramifications of medical reports of stability in her MS. Similarly, Ms. W. argues that the ALJ improperly discounted her subjective symptom allegations by relying only upon

5

objective medical evidence, including the same "stability" analysis. Ms. W. also contends that the ALJ failed to explain his inconsistent assessments of the severity of her limitations in concentration, persistence, and pace ("CPP") within his decision, which lacked a logical bridge from the evidence of Ms. W.'s deficiencies in CPP to the restrictions incorporated into the RFC. Based on these shortcomings, Ms. W. asks the Court to remand the ALJ's decision. Ms. W.'s arguments, considered together, reveal a pattern of analysis by the ALJ that is not supported by substantial evidence.

### A. Insufficient Stability Rationale

In his RFC analysis, the ALJ began by using 2-1/2 pages to thoroughly recite Ms. W.'s hearing testimony regarding her symptoms and limitations then simply concluded that Ms. W.'s "statements about the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [DE 12 at 36].

The ALJ then presented selected objective medical evidence from the record reflecting the sequence of Ms. W.'s medical care from about February 2014 through February 2015. In discussing each piece of cited medical evidence, the ALJ recited the substance of the evidence almost verbatim, including examination observations and findings, test results, and Ms. W.'s self-reported symptoms, followed by a brief, conclusory statement regarding the effect of that evidence on Ms. W.'s disability analysis. On multiple occasions, the ALJ's "recitation plus conclusion" analysis led him to conclude that certain evidence should be discounted based upon treating source assessments that Ms. W.'s condition is stable.

In support, the ALJ consistently references by citation only parts of records from Ms. W.'s 2014–2015 office visits to nurse practitioners, Jennifer Evans and Dineke Francis, and her June and July 2014 visits to neurologist, Dr. Arkadiy Konyukhow. In the cited records, Evans and Francis assessed Ms. W.'s "overall condition" as "stable" ("the Stability Assessments") at three separate office visits. Dr. Konyukhow's progress notes, test results, and findings cited by the ALJ reflect assessments that preceded Ms. W.'s MS diagnosis, but do not use any form of the word "stable." The ALJ's only other reference to medical evidence explicitly using the word "stable" was his separate recitation—almost verbatim—of Ms. W.'s MRI results from cervical spine, brain, and lumbar spine MRIs in 2014, 2015, and 2016 finding "stable overall demyelinating plaque burden compared to four months prior," "stable, overall mild plaque burden compared to an MRI from one year prior," or "stable lumbar spondylosis." [*Id.* at 39–40].

As shown below, the ALJ's conclusions based on this stability evidence are not supported by substantial evidence because he failed to build the requisites logical bridges from the evidence of record, including the stability evidence, to his conclusions leading to his final RFC determination.

### 1. Ignoring Contradictory Evidence

"An ALJ cannot rely only on the evidence that supports her opinion." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (internal citation omitted). "And while an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability." *Id.* In other words, an ALJ cannot cherry-pick evidence to support his conclusion. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *see*

7

also *Denton*, 596 F.3d at 425. Review of the medical records cited by the ALJ and referenced in Ms. W.'s instant briefing shows exactly this.

There is no dispute that the ALJ correctly recited positive or "normal" findings from Ms. W.'s various examinations and medical testing in his presentation of medical evidence. Similarly, no one disputes that the ALJ properly recited the Stability Assessments, the stable MRI results, and Dr. Konyukhow's notes leading to her Ms. W.'s MS diagnosis. However, the ALJ prioritized these particular records as evidence of stability without reference to other evidence relevant to a disability determination.

For instance, the same medical records that include stability assessments and other normal findings also include Ms. W.'s own reports of ongoing pain, decreased sensation and weakness on her right side, difficulty walking, memory issues, and other physical limits. They also reveal the treating sources' diagnoses and treatment plans, which included continuing prescriptions for exercise and narcotic drug therapy. While the ALJ recited some of this presumably competing evidence, he offers no explanation as to what role this evidence played in his conclusions. Instead, he focuses on the Stability Assessments without reconciling the positive findings in the objective medical evidence with Ms. W.'s diagnoses, ongoing treatments, and repots of continuing, possibly deteriorating symptoms. In so doing, the ALJ appears to have ignored entirely evidence that contradicts his RFC analysis without adequate explanation.

### 2. Stability vs. Disability

The ALJ's repeated emphasis on the stability evidence without adequate explanation of potentially competing evidence is also concerning because stability does

not equate to a lack of disability. A stable condition is one that is unchanged rather than improved or non-severe. *See Seruya v. Berryhill*, No. 16-C-10896, 2017 WL 4650886, at *5 (N.D. Ill. Oct. 17, 2017). One can be both stable and disabled. *See, e.g., Goffron v. Berryhill*, 17 C 3169, 2018 WL 2364891, at *3 (N.D. Ill. May, 2018); *Shell v. Colvin,* 1:11-CV-301-PRC, 2013 WL 5257830, at *13 (N.D. Ind. Sept. 16, 2013). Nevertheless, the ALJ uses the stability evidence as his rationale, albeit brief and imprecise, for discounting Ms. W.'s symptom testimony and assessing the weight of the medical opinion evidence. With no further explanation, the ALJ's emphasis on the stability of Ms. W.'s MS implies a misunderstanding that stability precludes a finding of disability. At the very least, the ALJ's emphasis on stability exposes a gap in his logic from the evidence of the record to his cursory conclusions related to Ms. W.'s RFC.

### 3. Subjective Symptom Analysis

The ALJ's emphasis on the stability evidence without further explanation also suggests that the ALJ relied solely on objective medical evidence in evaluating the alleged subjective symptoms arising from Ms. W.'s pain. When evaluating a claimant's subjective complaints, an ALJ first determines whether the claimant has a medically determinable impairment capable of causing the alleged symptoms before evaluating the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. 20 C.F.R. § 404.1529(b)–(c). When evaluating the intensity and persistence of a claimant's alleged symptoms, the ALJ considers the totality of the evidence, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain

or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes; (5) treatment, other than medication, the claimant receives; (6) any measures used to relieve pain or other symptoms; and (7) other factors regarding the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

An "ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017) (quoting *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009)); *see also Carradine v. Barnhart,* 360 F.3d 751, 754 (7th Cir. 2004) ("Pain is always subjective in the sense of being experienced in the brain."). "[P]ain alone can be disabling [therefore testimony] of severe pain cannot be disregarded simply because it is not supported by objective medical evidence." *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016).

Here, the ALJ's subjective symptom analysis provides no connection between Ms. W.'s symptom testimony and the objective medical evidence in the record to support his conclusion discounting her statements about the intensity, persistence, and limiting effects of her symptoms. The ALJ recited considerable testimonial and medical evidence that may fit into the Section 1529 categories listed above but failed to discuss all the factors clearly. Moreover, the ALJ's only evident rationales for discounting Ms. W.'s symptom statements are revealed through his statement that Ms. W. "reported that she was exercising regularly" and that her "treating sources assessed [her] multiple sclerosis was stable with treatment." [DE 12 at 43]. In support, the ALJ again cited

Nurse Practitioner Evans's office visit notes stating: "Habits: Last saw a dentist 2013. Exercising regularly" [DE 12 at 417], the same Stability Assessments by the nurse practitioners, and Dr. Konyukhow office visit records.

In challenging the ALJ's subjective symptom analysis, Ms. W. directs the Court's attention to the recommendation of one of her treating doctors, Dr. George Achufusi, on July 17, 2014, to increase aerobic activity, or exercise. [*See* DE 12 at 410]. In light of this apparent prescription for exercise, the Court cannot discern why the ALJ found Ms. W.'s regular exercise in compliance with her doctor's recommendation sufficient to discount her symptom statements. Additionally, the ALJ's reliance, once again, upon the same stability evidence without further explanation leaves this Court unable to trace the path of his reasoning or determine exactly what evidence he considered in discounting her statements. *See Scott,* 297 F.3d at 595. Taken together, the ALJ's stated rationales for discounting Ms. W.'s symptom statements focus on objective medical evidence without any connection to her subjective symptom allegations. Accordingly, the ALJ's subjective symptom analysis is not supported by substantial evidence.

### 4. Medical Opinion Evidence

The ALJ also improperly favored the opinions of State Agency reviewing consultants regarding Ms. W.'s physical limitations over the opinions of an examining consultant and Ms. W.'s own treating physicians.

"An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.

11

2003). Yet "an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). Nevertheless, "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled . . . can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Id.*

Moreover, treating source opinions are generally given more weight because treating sources are more familiar with a claimant's conditions and circumstances. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). For claims filed before March 27, 2017, like Ms. W's, a treating source's opinion is to be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). When a treating source's opinion is not given controlling weight, the ALJ must consider the following factors: (1) the examining relationship, (2) the treatment relationship, specifically its length, nature, and extent, of the treatment relationship, (3) the supportability of the opinion, (4) its consistency with the record as a whole, and (5) the specialty of the treating source. *Id.*; *see also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). Additionally, the ALJ must provide good reasons in his decision for the weight given to the treating source's opinion and must not substitute his own judgment for the physician's opinion without relying on other medical evidence or authority in the record. *See Sharbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Clifford*, 22 F.3d at 869.

Here, the ALJ gave great weight to the opinions of State Agency reviewing consultants, Drs. B. Whitley and J. V. Corcoran, who opined—without examining Ms. W.—that she can perform light work with some limitations. Before reporting this conclusion, the ALJ recited the physical limitations identified by Drs. Whitley and Corcoran then stated that the consultants "are familiar with the Administrations' [sic] disability programs, rules and regulations [and their opinions are] consistent with the claimant's treating sources' assessments that the claimant's multiple sclerosis was stable with treatment." [DE 12 at 41 (citing once again the nurse practitioners' Stability Assessments and Dr. Konyukhow's June and July 2014 office visit records)].[3]

The ALJ's consideration of the medical assessment of State Agency consultative examiner, neurologist Dr. J. Smejkal, started with recitation of his examination observations, findings, and diagnoses—consistent with the presentation of other evidence from examining medical sources—before according "some weight" to his assessment explaining in one sentence that "it is partially consistent with the evidence of record, including Dr. Whitley's and Dr. Corcoran's opinions." [DE 12 at 41]. Following the same pattern, the ALJ recited the opinions of Ms. W.'s treating doctors, Dr. John Kelly and Dr. Syed Quadri, as to her physical limitations before according

---

[3] Similarly, the ALJ gave great weight to the opinions of State Agency psychological and psychiatric consultants, Dr. Donna Unversaw and Dr. Joelle Larsen, after reporting their general opinions that Ms. W. suffers from mild psychological and psychiatric symptoms. He then concluded that they "are familiar with the Administrations' [sic] disability programs, rules and regulations" and that their "opinions are consistent with the claimant's course of treatment for her psychiatric symptoms, and her reported activities of daily living, which included driving regularly and caring for her children." [DE 12 at 41–42]. However, Ms. W. does not challenge the ALJ's handling of their opinions, so they need not be discussed further here.

them only little weight. The ALJ reasoned that Dr. Kelly's opinion was worthy of less weight because he did not start treating Ms. W. until after her date last insured. The ALJ further reasoned separately, using identical language and citations, that both Dr. Kelly's opinion and Dr. Quadri's opinion "is not consistent with the objective evidence of record including Dr. Whitley's and Dr. Corcoran's opinions or with the claimant's treating sources' assessments that the claimant's multiple sclerosis was stable with treatment." [DE 12 at 42 (citing the nurse practitioners' Stability Assessments and Dr. Konyukhow's June and July 2014 office visit records one more time)].

In granting the opinions of Drs. Whitley and Corcoran great weight, the ALJ relies almost exclusively on the Stability Assessments and Dr. Konyukhow's records without explaining how these limited records support the reviewing doctors' opinions. Even more grievous, however, is the ALJ's error in favoring Drs. Whitley and Corcoran's opinions over Dr. Smejkal's opinion, without sufficient explanation, when Dr. Smejkal examined Ms. W. and Drs. Whitley and Corcoran did not. Moreover, the ALJ's decision that the opinions of Ms. W.'s treating physicians, Drs. Kelly and Quadri, were not worthy of controlling weight is also based almost exclusively on the stability evidence without further explanation. Having discounted Dr. Kelly's and Dr. Quadri's opinions, which included the most restrictive limitations on work for Ms. W., the ALJ arguably considered most of the Section 1527 factors. However, he did not explain how the stability evidence, or any other evidence for that matter, failed to support Dr. Kelly's and Dr. Quadri's opinions.

14

Therefore, the ALJ's medical opinion analysis also lacks the requisite logical bridge between the evidence and his conclusions on the opinion evidence such that they and the resulting RFC are not supported by substantial evidence.

As to Dr. Kelly, the ALJ also reported that he did not start treating Ms. W. until after her date last insured implying an additional rationale for discounting his opinion. Yet the ALJ does not offer any authority or analysis to explain why this justifies discounting Dr. Kelly's opinion. Indeed, Ms. W.'s briefing before this Court presents an argument that the opinion of Dr. Kelly, as Nurse Practitioner Evans's supervisor, may nevertheless qualify for consideration as a treating source opinion. Given the other flaws in the ALJ's decision, the Court need not determine whether Dr. Kelly's opinion should or should not have been considered, but suggests the ALJ on remand carefully consider the proper role of Dr. Kelly's opinion in this case.

### B. Limitations on Concentration, Persistence, and Pace

Ms. W. also contends that the ALJ improperly failed to explain his inconsistent assessments of the severity of her limitations in concentration, persistence, and pace ("CPP") within his decision. Additionally, Ms. W. alleges that the ALJ's decision lacks a logical bridge from the evidence of her deficiencies in CPP to the restrictions the ALJ incorporated into the RFC. The Court agrees.

In assessing the severity of Ms. W.'s mental impairments at Step Two, the ALJ found that Ms. W. had mild limitation in the functional area of concentrating, persisting, or maintaining pace. In support, the ALJ recited parts of Ms. W.'s own Function Report dated October 14, 2014. The ALJ noted Ms. W.'s statement that "she

had difficulty with memory, understanding, and concentration, and that she could not pay bills, or balance a checkbook due to memory problems related to her multiple sclerosis." [DE 12 at 31]. The ALJ then reported other statements from Ms. W. that she could drive, transport her children, take care of her personal hygiene and medications, count change, sew when her hand cooperated, pay attention for hours at a time, and follow spoken instructions. [*Id.* at 31–32]. The ALJ then concluded that "[t]he medical evidence during the relevant time period remains devoid of the claimant's alleged limits during the relevant time period." [*Id.* at 32].

The ALJ also recited from the records of Dr. Jeffrey Samelson, the consultative psychologist who examined Ms. W. in October 2014. The ALJ reported that Dr. Samelson assessed Ms. W. with "unimpaired comprehension, judgment, and understanding." [*Id.*] The ALJ then acknowledged Dr. Samelson's finding that Ms. W. "had memory issues and problems with sustained concentration and persistence," but then found that Dr. Samelson's "findings [were] not consistent with this opinion, and the claimant's actual functioning, including driving and handling responsibilities of the home and her children, supports only mild limitations." [*Id.*]. The ALJ concluded his Step Two CPP analysis by stating that he considered Ms. W.'s "potential deficiencies in this area based on her multiple sclerosis, as discussed in Finding 5, *infra* [*i.e.*, the RFC analysis that followed]." [*Id.*].[4]

---

[4] Notably, the ALJ's Step Two analysis of Ms. W.'s functional ability to understand, remember, or apply information was identical to this analysis of Ms. W.'s CPP limitations up through the recitation of Dr. Samelson's assessment that Ms. W. had "unimpaired comprehension, judgment, and understanding." [*Compare* DE 12 at 31 ("first functional area" analysis), *with id.* at 31–32 ("third functional area" analysis)].

In the RFC, the ALJ stated that "due to moderate limits in concentration, persistence, or pace, [Ms. W.] can understand, remember and carryout simple, routine and repetitive tasks; she is able to engage in no more than occasional decision-making; and she can be exposed to no more than occasional changes in job setting." [*Id.* at 33]. The ALJ's analysis in support of that RFC, however, did not explicitly mention moderate limitations in CPP or the specific limitations the ALJ included in the RFC.

Instead, the ALJ's RFC analysis in relation to Ms. W.'s limitations in CPP followed the same pattern of "recitation plus conclusion" discussed above. The ALJ acknowledged Ms. W.'s own assessment of her memory, concentration, and persistence issues by reciting pretty thoroughly her subjective symptom testimony. The ALJ also considered Dr. Samelson's opinion dated October 20, 2014. Most relevant was the ALJ's recitation of Dr. Samelson's (1) allegedly inconsistent assessments that Ms. W.'s "sustained concentration and persistence were predicted to be problematic" but that she was "capable of being around people in work-related settings, her understanding, comprehension and judgment appeared intact" and (2) his allegedly inconsistent opinions that she "did not appear capable of work-related activities due to memory issues and problems with sustained concentration and persistent" but that her "comprehension, judgment, understanding and social interaction appeared relatively unimpaired." [*Id.* at 40]. The ALJ then afforded Dr. Samelson's opinion only some weight with the simple, on-sentence explanation that "the objective evidence of record fails to support that [Ms. W.] is not capable of work due to memory issues."[*Id.*].

17

Overall, the ALJ's assessment of Ms. W.'s limitations in CPP is confusing because he finds mild limitation in CPP at Step Two but incorporates an apparent finding of moderate limitations in CPP into his RFC. In his brief, the Commissioner attempts to distinguish the two analyses by arguing that the ALJ's Step Two finding was only related to his mental impairments while the RFC also accounted for limitations arising from Ms. W.'s MS. While the Commissioner's suggestion is plausible, the ALJ did not actually make that distinction clear in his opinion. Furthermore, the RFC analysis does not demonstrate how, or from what evidence, the ALJ derived his conclusion of moderate limitations in CPP or what evidence supports the limitations of simple, routine and repetitive tasks, occasional decision-making, and occasional changes in job setting he included in RFC presumably accounting for moderate limitations in CPP.

While it is possible that the ALJ's differing conclusions as to Ms. W.'s limitation in CPP may be supportable, the ALJ's decision does not articulate how these potentially conflicting conclusions jibe. More importantly, the ALJ's failure in the RFC analysis to connect evidence of Ms. W.'s limitations in CPP that allegedly account for the full range of her limitations is problematic given authority that "simple tasks" restrictions do not, on their own and without further explanation, account for moderate limitations in CPP. *See Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015); *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citing *O'Connor-Spinner*, 627 F.3d at 619 ; *Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009).

In summary, the ALJ has failed to provide the Court with sufficient connective rationale, or logical bridge, to discern whether the purported CPP restrictions in the

RFC account fully for Ms. W.'s unique limitations in the ability to maintain concentration, persistence, and pace. Therefore. the Court cannot be certain that the vocational expert's reliance on the ALJ's RFC assessment effectively provided enough information from which to determine accurately what jobs Ms. W., with her unique limitations, may be able to perform. See *Winsted v. Berryhill*, 915 F.3d 466, 471 (7th Cir. 2019). As a result, the ALJ has not supported his RFC with substantial evidence to support his RFC related to her limitations in concentration, persistence, and pace.

## V. CONCLUSION

For the reasons stated above, the ALJ's decision is not supported by substantial evidence and therefore warrants remand. Accordingly, the Commissioner's decision is **REVERSED AND REMANDED**. The Clerk is instructed to enter judgment in favor of Plaintiff, Randi R. W.

**SO ORDERED** this 28th day of October 2019.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge